## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AMBER LOPEZ, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| GEISINGER HEALTH and NUANCE COMMUNICATIONS, INC., | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff Amber Lopez ("Plaintiff"), on behalf of herself and all others similarly situated (the "Class" or "Class Members"), files this Class Action Complaint ("Complaint") against Defendants Geisinger Health ("Geisinger") and Nuance Communications, Inc. ("Nuance" and, with Geisinger, "Defendants"), and complains and alleges upon personal knowledge as to herself and information and belief as to all other matters.

## INTRODUCTION

1.    Plaintiff brings this class action against Defendants for their failure to secure and safeguard Plaintiff's and Class members' personally identifiable information ("PII")[1] and personal health information ("PHI"), including names, dates of birth, address, admit and discharge or transfer codes, medical record numbers, race, gender, phone numbers, and care location information.

2.    Geisinger is a healthcare provider serving urban and rural communities in Pennsylvania.

---

[1] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual.

3.      Nuance is a computer software technology corporation based out of Burlington, Massachusetts.[2]  Nuance is a third-party IT vendor of Geisinger.

4.      On or about November 29, 2023, Geisinger discovered that a former Nuance employee had accessed and acquired the PII/PHI of Plaintiff and Class members (the "Data Breach").  Following an investigation, Nuance determined that more than one million Geisinger patients were impacted by the Data Breach.  Nuance, on behalf of Geisinger, began sending out notice letters to individuals impacted on June 21, 2024.[3]

5.      Defendants had numerous statutory, regulatory, contractual, and common law duties and obligations, including those based on their affirmative representations to Plaintiff and the Class, to keep their PII/PHI confidential, safe, secure, and protected from unauthorized disclosure or access.

6.      Defendants promised Plaintiff and Class members that they, or the third parties they contract and share PII/PHI with, would implement and maintain reasonable and adequate security measures to secure, protect, and safeguard Plaintiff's and Class members' PII/PHI against unauthorized access and disclosure. Defendants breached those promises by, inter alia, failing to, or sharing PII/PHI with third parties who failed to, implement and maintain reasonable security procedures and practices to protect Plaintiff's and Class members' PII/PHI from unauthorized access and disclosure.

7.      Defendants owed Plaintiff and Class Members a duty to take all reasonable and

---

[2] See Who We Are, NUANCE, https://www.nuance.com/company-overview/who-we-are.html (last visited July 2, 2024).

[3] See Geisinger Provides Notice Of Nuance's Data Security Incident, GEISINGER (June 24, 2024) https://www.geisinger.org/about-geisinger/news-and-media/news-releases/ 2024/06/24/18/17/geisinger-provides-notice-of-nuances-data-security-incident (the "Data Breach Notice").

necessary measures to keep the PII/PHI collected safe and secure from unauthorized access. Defendants solicited, collected, used, and derived a benefit from the PII/PHI, yet breached its duty by failing to implement or maintain adequate security practices.

8.    The sensitive nature of the data exposed through the Data Breach signifies that Plaintiff and Class Members have suffered irreparable harm. Plaintiff and Class Members have lost the ability to control their PII/PHI and are subject to an increased risk of identity theft.

9.    As a result of Defendants' inadequate security and breach of their duties and obligations, the Data Breach occurred, and Plaintiff's and Class members' PII/PHI was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiff brings this action on behalf of herself and all persons whose PII/PHI was exposed as a result of the Data Breach.

10.    Plaintiff, on behalf of herself and all other Class members, asserts claims for negligence, negligence per se, breach of fiduciary duty, breach of implied contract, and unjust enrichment, and, and seeks declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

11.    Plaintiff Amber Lopez resides in Myerstown, Pennsylvania. Ms. Lopez was a patient of Geisinger. Ms. Lopez received a letter from Nuance dated June 21, 2024 informing her of the Data Breach. The letter received by Ms. Lopez is attached hereto as Exhibit 1.

12.    Plaintiff has been forced to spend time addressing and attempting to mitigate further harm and injury resulting from the Data Breach. Plaintiff has experienced an uptick in spam calls, texts, and emails. She has also experienced multiple fraudulent transactions in her financial account. Furthermore, as a result of the Data Breach, Plaintiff has been forced to, and will continue

3

to, invest significant time monitoring her accounts to detect and reduce the consequences of likely identity fraud.  As a result of the Data Breach, Plaintiff is now subject to substantial and imminent risk of future harm.  Plaintiff has also suffered emotionally over the extreme stress resulting from the Data Breach.  Had Plaintiff known that Defendants do not adequately protect the PII/PHI in their Possession, Plaintiff would not have agreed to provide Defendants with her PII/PHI or obtained healthcare services from Geisinger.

13.    Plaintiff obtained healthcare services from Geisinger.  As a condition of receiving services, Geisinger required Plaintiff to provide it with her PII/PHI.  Plaintiff does not have any ability to protect her PII/PHI that was or remains in Defendants' possession.

14.    Based on representations made by Defendants, Plaintiff believed that Defendants had implemented and maintained reasonable security and practices to protect her PII/PHI.  With this belief in mind, Plaintiff provided her PII/PHI to Defendants in exchange for receiving healthcare services from Defendants.

15.    In connection with providing healthcare services to Plaintiff, Defendants collected, stored, shared, and maintained Plaintiff's PII/PHI on their systems, including the systems involved in the Data Breach.  Had Plaintiff known that Defendants do not adequately protect the PII/PHI in their possession, she would not have agreed to provide Defendants with her PII/PHI or obtained healthcare services from Defendants.

16.    As a direct result of the Data Breach, Plaintiff has suffered injury and damages including, inter alia, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of her highly sensitive PII/PHI; deprivation of the value of her PII/PHI; and lost time and money mitigating the effects of the Data Breach; and overpayment for services that did not include adequate data security.

17.    Defendant Geisinger Health is a Pennsylvania nonprofit corporation with its headquarters located at 100 North Academy Avenue, Danville, Pennsylvania 17822.

18.    Defendant Nuance Communications, Inc. is a Delaware corporation with its principal place of business located in Burlington, Massachusetts, and service of process address located at 84 State Street, Boston, Massachusetts, 02109 through its registered agent, Corporation Service Company.

**JURISDICTION AND VENUE**

19.    This Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2) because (a) there are 100 or more Class Members, (b) at least one Class Member is a citizen of a state that is diverse from Defendants' citizenship, and (c) the aggregate matter in controversy exceeds $5,000,000, exclusive of interests and costs.

20.    This Court has general personal jurisdiction over Geisinger because Geisinger is registered to do business, and maintains its principal place of business, in Danville, Pennsylvania.

21.    This Court has personal jurisdiction over Defendant Nuance Communications, Inc. because it regularly conducts business in this State, contracts to supply goods or services in this State, and has sufficient minimum contact in this State. This Court has specific personal jurisdiction over Nuance because Nuance purposely availed themselves of Pennsylvania by serving as a vendor that provides information technology services to Geisinger.

22.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Geisinger is headquartered in this District, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

**FACTUAL ALLEGATIONS**

***Overview of Defendants***

5

23.     Defendant Geisinger is one of the nation's leading providers of value-based care. serving 1.2 million people in urban and rural communities across Pennsylvania.[4]

24.     Geisinger claims to generate $10 billion in annual revenues across 134 care sites - including 10 hospital campuses, and Geisinger Health Plan, with 600,000 members in commercial and government plans. "With 26,000 employees, including 1,600 employed physicians, Geisinger is among Pennsylvania's largest employers with an estimated economic impact of $14 billion to the state's economy." [5]

25.     Geisinger provides its patients with a Notice of Privacy Practices, which states that "Geisinger may only use and disclose your PHI pursuant to an authorization, or as otherwise permitted or required by law…Other uses and disclosures of your PHI not covered by the categories included in this Notice or applicable laws, rules or regulations will be made only with your written permission or authorization."[6]

26.     In the regular course of its business, Geisinger collects and maintains the PII/PHI of its current and former patients. Geisinger required Plaintiff and Class members to provide their PII/PHI as a condition of receiving healthcare services.

27.     Geisinger contracts with third-party vendors, including Defendant Nuance, for various services. According to Geisinger's Confidentiality for Vendors, "[Geisinger] take[s] the privacy and confidentiality of our patients, members and employees very seriously. . . Any vendor that has incidental exposure to PHI in the performance of their contractual duties is expected to

---

[4] *See Data Breach Notice*, *supra* n.3.

[5] *See Data Breach Notice, supra* n.3.

[6] *Geisinger Notice of Privacy Practices*, https://www.geisinger.org/about-geisinger/corporate/corporate-policies/hipaa/notice-of-privacy-practices-ghs (last visited July 2, 2024).

follow all instructions from supervising Geisinger staff regarding confidentiality, and to keep such information strictly confidential. PHI should not be retained or utilized."[7]

28.     Defendant Nuance provides healthcare technology services, including clinical solutions, diagnostic solutions, and revenue services.  On its website, Nuance claims its "AI-powered solutions" are used "by 77% of hospitals and 10,000 healthcare organizations worldwide" and "capture 300 million patient stories each year."[8]

29.     In its regular course of business, Nuance "collect[s] and use[s] consumer health data as reasonably necessary to provide you with the products you have requested or authorized."[9] Nuance states that "Nuance does not sell your personal data. . . Nuance has a range of privacy and security controls across its organizations to ensure compliance with the General Data Protection Regulation (GDPR). . . We follow generally accepted standards to protect the personal data submitted to us, both during transmission and once it is received. Information you provide to us is stored on our secure servers."[10]

30.     Nuance claims it "remain[s] firmly committed to helping our clients comply with

---

[7] See Confidentiality for Vendors, GEISINGER, https://www.geisinger.org/-/media/OneGeisinger/pdfs/ghs/about-geisinger/vendor-relations/Confidentiality-for-Vendors.pdf?sc_lang=en&hash=B840CC881B4319B9DAFEDD4C9FF4C6A1 (last visited July 2, 2024).

[8] See Healthcare AI Solutions & Services, NUANCE, https://www.nuance.com/healthcare.html#standardpage-mainpar_multicolumn_33546632 (last visited July 2, 2024).

[9] See Consumer Health Data Privacy Policy, NUANCE, https://www.nuance.com/about-us/company-policies/privacy-policies/consumer-health-data-privacy-policy.html (last visited July 2, 2024).

[10] See Nuance Privacy Statement, NUANCE, https://www.nuance.com/about-us/company-policies/privacy-policies.html#collect (last visited July 2, 2024).

their data protection requirements."[11]  "Nuance assesses our process, procedures, and systems on a routine and regular basis to ensure that updates and improvements are implemented to maintain our standards. assesses our process, procedures, and systems on a routine and regular basis to ensure that updates and improvements are implemented to maintain our standards. . . Nuance conducts training on at least an annual basis, and more frequently as needed, to ensure workforce members are aware of their roles and responsibilities related to data governance."[12]

31.    On its website, Nuance claims its patient data security approach includes:

Assigning dedicated personnel to support privacy and security activities throughout the organization.

Conducting regular HIPAA and data protection training.

Restricting access as appropriate and necessary to information assets.

Managing authorized user access as well as ensuring employee accountability for any unauthorized use or disclosure. . . [13]

32.    By creating and maintaining massive repositories of PII/PHI, Defendants have provided a particularly lucrative target for data thieves looking to obtain, misuse, or sell such data.

***The Data Breach and Notice Letter***

33.    On or around November 29, 2023, Geisinger discovered that a former Nuance employee had accessed certain Geisinger patient information "two days after the employee had been terminated." [14]

---

[11] *Global Privacy—Data Governance Program*, NUANCE, https://www.nuance.com/about-us/trust-center/privacy/data-governance.html (last visited July 2, 2024).

[12] *Id.*

[13] *Global Privacy—HIPAA Requirements*, NUANCE, https://www.nuance.com/about-us/trust-center/privacy/hipaa.html (last visited July 2, 2024).

[14] *See Data Breach Notice, supra* n.3.

34.     Nuance did not revoke the employee's access to the health system's records upon termination, which allowed unauthorized access to the personal information of more than a million patients.[15] Nuance determined the former employee may have accessed and taken information pertaining to more than one million Geisinger patients.[16]

35.     According to Nuance's investigation, the compromised data include a combination of date of birth, address, admit and discharge or transfer code, medical record number, race, gender, phone number and facility name abbreviation.[17]

36.     Although Geisinger discovered and notified Nuance of the Data Breach on or about November 29, 2023, Defendants did not begin to notify impacted breach victims about the Data Breach until approximately June 24, 2024, over six months after the Data Breach was discovered.[18] Defendants' failure to promptly notify Plaintiff and Class members that their PII/PHI was accessed and stolen virtually ensured that the unauthorized third parties who exploited those security lapses could monetize, misuse, or disseminate that PII/PHI before Plaintiff and Class members could take affirmative steps to protect their sensitive information.

37.     The compromised data contained Plaintiff's and Class Members' PII/PHI that was accessible, unencrypted, unprotected, and vulnerable to acquisition and/or exfiltration by the unauthorized actor.

38.     Despite the ongoing and long-term risks for financial fraud and identity theft for victims of the Data Breach, Defendants do not offer sufficient identity protection services for the

---

[15] Andrea Fox, Geisinger alerts patients to data incident involving terminated Nuance employee, HEALTHCAREITNEWS (June 27, 2024), https://www.healthcareitnews.com/news/geisinger-alertspatients-data-incident-involving-terminated-nuance-employee.

[16] See Data Breach Notice, supra n.3.

[17] See Data Breach Notice, supra n.3.

[18] See Data Breach Notice, supra n.3.

affected individuals.  While Defendants provided instructions on how to obtain a credit report from the three credit reporting companies, and to place fraud alerts and credit or security freeze, this was is far from sufficient, and placed the burden on the Data Breach victims to spend time and effort to sign up for these services provided, and future hardship to obtain credit.

39.    Plaintiff's and Class Members' PII/PHI was provided to Defendants, either directly or indirectly, with the reasonable expectation and mutual understanding that Defendants would comply with its obligation to keep such information confidential and secure from unauthorized access.  Plaintiff and Class Members are harmed by such failure.

40.    Defendants also benefited directly from the PII/PHI provided by Plaintiff and Class Members.  As a healthcare provider and a third-party vendor, Defendants use the data they collect to perform their paid services to their customers.

41.    By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII/PHI, Defendants assumed legal and equitable duties and knew, or should have known, that they were responsible for protecting Plaintiff's and Class Members' PII/PHI from unauthorized disclosure.

***Defendants Knew That Criminals Target PII.***

42.    At all relevant times, Defendants knew or should have known that Plaintiff's and all other Class Members' PII/PHI was a target for malicious actors.  Despite such knowledge, Defendants failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class Members' PII/PHI from unauthorized access that Defendants should have anticipated and guarded against.

43.    Defendants' data security obligations were particularly important given the substantial increase in data breaches preceding the date of the Data Breach, which has been widely

reported in the last few years.

44.     Cyber criminals seek out PHI at a greater rate than other sources of personal information. In a 2024 report, the healthcare compliance company Protenus found that there were 1,161 medical data breaches in 2023 with over 171 million patient records exposed.[19]  This is an increase from the 1,138 medical data breaches which exposed approximately 59 million records that Protenus compiled in 2023.

45.     In the wake of the significant rise in data breaches, the Federal Trade Commission has also issued an abundance of guidance for companies and institutions that maintain individuals' PII.[20]

46.     As a result of the notoriety of cyberattacks on systems like Defendants', several other government entities have also issued warnings to potential targets so that they may be alerted and prepared for a potential attack like the Data Breach.

47.     The significant rise in data breaches have been a consistent problem for the past several years, providing Defendants sufficient time and notice to improve the security of its systems and engage in stronger, more comprehensive cybersecurity practices.

48.     PII/PHI is a valuable property right.[21]  The value of PII/PHI as a commodity is

---

[19] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUS. INSIDER (Nov. 19, 2019), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

[20] *See, e.g., Protecting Personal Information: A Guide for Business*, FED. TRADE COMM'N., https://www.ftc.gov/tips-advice/business-center/guidance/protecting-personal-information-guide-business (last visited July 2, 2024).

[21] *See* Marc van Lieshout, *The Value of Personal Data*, 457 IFIP ADVANCES IN INFO. AND COMMC'N. TECH. 26 (May 2015), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . . .").

measurable.[22]  "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[23]  American companies are estimated to have spent over $19 billion acquiring consumers' personal data in 2018.[24]  In fact, it is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

49.    As a result of its real value and the recent large-scale data breaches, identity thieves and cybercriminals have openly posted credit card numbers, Social Security numbers, and other PII directly on various Internet websites, making the information publicly available.  This information from various breaches, including the information exposed in the Data Breach, can be aggregated and become more valuable to thieves and more damaging to victims.

50.    Consumers place a high value on the privacy of their PII/PHI.  Researchers shed light on how much consumers value their data privacy—and the amount is considerable.  Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[25]

51.    Given these factors, any company that transacts business with a consumer and then

---

[22] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (Apr. 28, 2014), http://www.medscape.com/viewarticle/824192.

[23] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD 4 (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[24] *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018*, *Up 17.5% from 2017*, INTERACTIVE ADVERT. BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

[25] Janice Y. Tsai, et al., *The Effect of Online Privacy Information on Purchasing Behavior: An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011), https://www.jstor.org/stable/23015560?seq=1.

compromises the privacy of consumers' PII/PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

52.     Therefore, Defendants clearly knew or should have known of the risks of data breaches and thus should have ensured that adequate protections were in place, particularly given the nature of the PII/PHI stored in their unprotected files and the massive amount of PII/PHI they maintains.

### *Theft of PII has Grave and Lasting Consequences for Victims.*

53.     Data breaches are more than just technical violations of their victims' rights.  By accessing a victim's personal information, the cybercriminal can ransack the victim's life: withdraw funds from bank accounts, get new credit cards or loans in the victim's name, lock the victim out of their financial or social media accounts, send out fraudulent communications masquerading as the victim, file false tax returns, destroy their credit rating, and more.[26]

54.     Identity thieves use stolen personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[27]  In addition, identity thieves may obtain a job using the victim's Social Security Number, rent a house, or receive medical services in the victim's name, and may even give the victim's personal information to police during

---

[26] *See* Laura Pennington, *Recent Data Breach Trends Mean Your Info Was Likely Stolen Last Year*, TOP CLASS ACTIONS (Jan. 28, 2019), https://topclassactions.com/lawsuit-settlements/privacy/data-breach/875438-recent-data-breach/.

[27] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h).  The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official state or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."  12 C.F.R. § 1022.3(g).

an arrest, resulting in an arrest warrant being issued in the victim's name.[28]

55.    Identity theft victims are frequently required to spend many hours and large sums of money repairing the adverse impact on their credit.

56.    As the United States Government Accountability Office noted in a June 2007 report on data breaches ("GAO Report"), identity thieves use identifying data such as Social Security Numbers to open financial accounts, receive government benefits, and incur charges and credit in a person's name.[29]  As the GAO Report states, this type of identity theft is more harmful than any other because it often takes time for the victim to become aware of the theft, and the theft can adversely impact the victim's credit rating.

57.    In addition, the GAO Report states that victims of this type of identity theft will face "substantial costs and inconveniences repairing damage to their credit records" and their "good name."[30]

58.    There may be a time lag between when PII/PHI is stolen and when it is used.[31]  According to the GAO Report:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft.  Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future

---

[28]  *See Warning Signs of Identity Theft*, FED. TRADE COMM'N, https://www.identitytheft.gov/#/Warning-Signs-of-Identity-Theft (last visited May 16, 2024).

[29] *See Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, U.S. GOV'T ACCOUNTABILITY OFF. (June 2007), https://www.gao.gov/new.items/d07737.pdf.

[30] *Id.* at 2, 9.

[31] For example, on average, it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.  John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9, 12 (2019), https://www.iiisci.org/Journal/PDV/sci/pdfs/IP069LL19.pdf.

harm.[32]

59.     Such personal information is such a crucial commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.  As a result of recent large-scale data breaches, identity thieves and cybercriminals have openly posted stolen credit card numbers, Social Security Numbers, and other PII/PHI directly on various Internet websites, making the information publicly available.

60.     Due to the highly sensitive nature of Social Security numbers, theft of Social Security numbers in combination with other PII/PHI (e.g., name, address, date of birth) is akin to having a master key to the gates of fraudulent activity.  TIME quotes data security researcher Tom Stickley, who companies employ to find flaws in their computer systems, stating, "If I have your name and your Social Security number and you haven't gotten a credit freeze yet, you're easy pickings."[33]

61.     Identity theft is not an easy problem to solve.  In a survey, the Identity Theft Resource Center found that most victims of identity crimes need more than a month to resolve issues stemming from identity theft, and some need over a year.[34]

62.     It is within this context that Plaintiff and all other Class Members must now live with the knowledge that their PII/PHI is forever in cyberspace and was taken by people willing to use that information for any number of improper purposes and scams, including making the

---

[32] U.S. GOV'T ACCOUNTABILITY OFF., *supra* n.22 at 29 (emphasis added).

[33] Patrick Lucas Austin, *'It is Absurd.' Data Breaches Show It's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME (Aug. 5, 2019, 3:39 P.M.), https://time.com/5643643/capital-one-equifax-data-breach-social-security/.

[34] *2021 Consumer Aftermath Report: How Identity Crimes Impact Victims, Their Families, Friends and Workplaces*, IDENTITY THEFT RES. CTR., https://www.idthecenter.org/identity-theft-aftermath-study/ (last visited May 16, 2024).

information available for sale on the black-market.

*Damages Sustained by Plaintiff and the Other Class Members*

63.    Plaintiff has been forced to spend time and money addressing and attempting to mitigate harm and injury resulting from the Data Breach, including but not limited to, fraudulent transactions on her financial account Chime.  Plaintiff has also experienced a significant increase in spam calls and texts.

64.    Plaintiff's personal and private information is extremely important to her, especially because of the nature of the health information that was provided.  Plaintiff has suffered emotionally over the stress resulting from the Data Breach and the frequent fraudulent attempts.

65.    Plaintiff and all other Class Members have suffered injury and damages, including, but not limited to (i) a substantially increased risk of identity theft and medical identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII; (iii) breach of the confidentiality of their PII; (iv) deprivation of the value of their PII, for which there is a well-established national and international market; and (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face.

## CLASS ALLEGATIONS

66.    This action is brought and may be properly maintained as a class action pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure.

67.    Plaintiff brings this action on behalf of herself and all members of the following Class of similarly situated persons:

> All persons whose PII/PHI was accessed in the Data Breach by unauthorized persons.

16

68.     Plaintiff reserves the right to amend the above definition or to propose other or additional classes in subsequent pleadings and/or motions for class certification.

69.     Plaintiff is a member of the Class.

70.     Excluded from the Class are Defendants, their respective affiliates, parents, subsidiaries, officers, agents, directors, the judge(s) presiding over this matter, and the clerks of said judge(s).

71.     This action seeks both injunctive relief and damages.

72.     Plaintiff and the Class satisfy the requirements for class certification for the following reasons:

73.     **Numerosity of the Class.** The members in the Class are so numerous that joinder of all Class Members in a single proceeding would be impracticable. Upon information and belief, there are over one million Class Members in the Class. The exact number and identity of Class Members is readily identifiable in Defendants' records, which will be a subject of discovery.

74.     **Common Questions of Law and Fact.** There are questions of law and fact common to the Class that predominate over any questions affecting only individual members, including:

a.      Whether Defendants' data security systems prior to the Data Breach met the requirements of relevant laws;

b.      Whether Defendants' data security systems prior to the Data Breach met industry standards;

c.      Whether Defendants owed a duty to Plaintiff and Class Members to safeguard their PII/PHI;

d.      Whether Defendants breached their duty to Plaintiff and Class Members to safeguard their PII/PHI;

e.      Whether Defendants failed to provide timely and adequate notice of the Data

17

Breach to Plaintiff and Class Members;

f.     Whether Plaintiff's and Class Members' PII/PHI was compromised in the Data Breach;

g.     Whether Plaintiff and Class Members are entitled to injunctive relief; and

h.     Whether Plaintiff and Class Members are entitled to damages as a result of Defendants' conduct.

75.     **Typicality.**  The claims or defenses of Plaintiff are typical of the claims or defenses of the proposed Class because Plaintiff's claims are based upon the same legal theories and violations of law.  Plaintiff and Class Members all had their PII/PHI stolen in the Data Breach. Plaintiff's grievances, like the proposed Class Members' grievances, all arise out of the same business practices and course of conduct by Defendants.

76.     **Adequacy of Representation.**  Plaintiff will fairly and adequately represent the Class on whose behalf this action is prosecuted.  Her interests do not conflict with the interests of the Class.

77.     Plaintiff and her chosen attorneys -- Shub & Johns LLC and Finkelstein, Blankinship, Frei-Pearson & Garber, LLP (collectively, "Plaintiff's Counsel") -- are familiar with the subject matter of the lawsuit and have full knowledge of the allegations contained in this Complaint.  In particular, Plaintiff's Counsel have respectively been appointed as lead counsel in several complex class actions across the country and has secured numerous favorable judgments in favor of its clients, including in cases involving data breaches.  Plaintiff's Counsel are competent in the relevant areas of the law and have sufficient experience to vigorously represent the Class Members.  Finally, Plaintiff's Counsel possess the financial resources necessary to ensure that a lack of financial capacity will not hamper the litigation and is willing to absorb the costs of the litigation.

78.    **Predominance.**  The common issues identified above arising from Defendants'
conduct predominate over any issues affecting only individual Class Members.  The common
issues hinge on Defendants' common course of conduct giving rise to the legal rights sought to be
enforced by Plaintiff on behalf of herself and all other Class Members.  Individual questions, if
any, pale in comparison, in both quantity and quality, to the numerous common questions that
dominate this action.

79.    **Superiority.**  A class action is superior to any other available method for
adjudicating this controversy.  The proposed class action is the surest way to fairly and
expeditiously compensate such a large number of injured persons, to keep the courts from
becoming paralyzed by a multitude of repetitive cases, and to reduce transaction costs so that the
injured Class Members can obtain the most compensation possible.

80.    Class treatment presents a superior mechanism for fairly resolving similar issues
and claims without repetitious and wasteful litigation for many reasons, including the following:

a.    It would be a substantial hardship for most individual members of the Class if they
were forced to prosecute individual actions.  Many members of the Class are not in
the position to incur the expense and hardship of retaining their own counsel to
prosecute individual actions, which, in any event, might cause inconsistent results.

b.    When the liability of Defendants have been adjudicated, the Court will be able to
determine the claims of all members of the Class.  This will promote global relief
and judicial efficiency in that the liability of Defendants to all Class Members, in
terms of monetary damages due and terms of equitable relief, can be determined in
this single proceeding rather than in multiple individual proceedings where there
will be a risk of inconsistent and varying results.

c.    A class action will permit an orderly and expeditious administration of the Class
claims, foster economies of time, effort, and expense, and ensure uniformity of
decisions.  If Class Members are forced to bring individual suits, the transactional
costs, including those incurred by Defendants, will increase dramatically, and the
courts will be clogged with a multiplicity of lawsuits concerning the very same
subject matter, with the identical fact patterns and the same legal issues.  A class
action will promote a global resolution and will promote uniformity of relief as to
the Class Members and as to Defendant.

d.     This lawsuit presents no difficulties that would impede its management by the Court as a class action. The class certification issues can be easily determined because the Class includes only customers of Defendants, the legal and factual issues are narrow and easily defined, and the Class Membership is limited. The Class does not contain so many persons that would make the Class notice procedures unworkable or overly expensive. The identity of the Class Members can be identified from Defendants' records, such that direct notice to the Class Members would be appropriate.

81.     **Injunctive relief.** Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final injunctive or equitable relief on a class-wide basis.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiff and the Class Against Both Defendants)

82.     Plaintiff realleges and incorporates by reference paragraphs 1 through 81 as if fully set forth herein.

83.     To perform its healthcare services, Defendant Geisinger collects Plaintiff's and Class Members' PII/PHI from its patients, and provides the PII/PHI to Defendant Nuance for its third-party software services.

84.     By collecting and storing their PII/PHI and using it for commercial gain, at all times relevant, Defendants owed a duty to Plaintiff and all other Class Members to exercise reasonable care in safeguarding and protecting their PII/PHI in its possession, custody, or control.

85.     Defendants owed a duty of care to Plaintiff and Class Members to provide data security consistent with statutory and industry standards and to ensure that its systems and networks and the personnel responsible for them adequately protected the PII/PHI.

86.    Defendants knew the risks of collecting and storing Plaintiff's and all other Class Members' PII/PHI and the importance of maintaining secure systems.  Defendants knew of the many data breaches that targeted companies that store PII/PHI in recent years.

87.    Given the nature of Defendants' businesses, the sensitivity and value of the PII/PHI it maintains, and the resources at its disposal, Defendants should have identified the vulnerabilities in their systems and prevented the Data Breach from occurring.

88.    Defendants breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII entrusted to them -- including Plaintiff's and Class Members' PII/PHI.

89.    Plaintiff and Class Members are a well-defined, foreseeable, and probable group of customers that Defendants were aware, or should have been aware, could be injured by inadequate data security measures.

90.    Plaintiff and Class Members have no ability to protect their PII/PHI that was or remains in Defendants' possession.

91.    It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class Members' PII/PHI to unauthorized individuals.

92.    But for Defendants' negligent conduct and breach of the above-described duties

owed to Plaintiff and Class Members, their PII/PHI would not have been compromised.

93.    Defendants' conduct was grossly negligent and departed from reasonable standards of care, including but not limited to failing to adequately protect Plaintiff's and Class Members' PII/PHI and failing to provide them with timely notice that their PII/PHI had been compromised.

94.    Neither Plaintiff nor Class Members contributed to the Data Breach and subsequent misuse of their PII/PHI as described in this Complaint.

95.    By failing to provide timely and complete notification of the Data Breach to Plaintiff and Class Members, Defendants prevented them from proactively taking steps to secure their PII/PHI and mitigate the associated threats.

96.    As a result of Defendants' above-described wrongful actions, inaction, and lack of ordinary care that directly and proximately caused the Data Breach, Plaintiff and all other Class Members have suffered and will continue to suffer economic damages and other injury and actual harm in the form of, inter alia: (i) a substantially increased risk of identity theft and medical identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII/PHI; (iii) breach of the confidentiality of their PII/PHI; (iv) deprivation of the value of their PII/PHI, for which there is a well-established national and international market; and (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face.

## COUNT II
## NEGLIGENCE *PER SE*
### (On Behalf of Plaintiff and the Class Against Both Defendants)

97.    Plaintiff realleges and incorporates by reference paragraphs 1 through 81 as if fully

set forth herein.

98.    Defendants had duties by statute to ensure that all information they collected and stored was secure and that they maintained adequate and commercially reasonable data security practices to ensure the protection of Plaintiff's and Class Members' PII/PHI.

99.    Defendants' duties arise from, *inter alia*, Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by a business, such as Defendants, of failing to employ reasonable measures to protect and secure PII/PHI.

100.    The FTC has published numerous guides for businesses that highlight the importance of implementing reasonable data security practices.  In 2016, the FTC updated its publication establishing cybersecurity guidelines for businesses, which makes thorough recommendations, including, but not limited to, for businesses to protect the personal customer information they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems.[35]

101.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTCA.  Orders resulting from these actions further clarify the measures businesses such as Defendants must take to meet their data security obligations and effectively put Defendants on notice of these standards.

---

[35] *Protecting Personal Information: A Guide for Business*, FED. TRADE COMM'N. (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

102.    Defendants violated Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiff's and all Class Members' PII/PHI and not complying with applicable industry standards.  Defendants' conduct was particularly unreasonable given the nature and amount of PII/PHI they obtain and store and the foreseeable consequences of a data breach involving PII/PHI, including, specifically, the substantial damages that would result to Plaintiff and other Class Members.

103.    Defendants' violation of the FTCA constitutes negligence *per se*.

104.    Plaintiff and Class Members are within the class of persons that Section 5 of the FTCA was intended to protect.

105.    The harm occurring as a result of the Data Breach is the type of harm against which Section 5 of the FTCA was intended to guard.

106.    It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and Class Members' PII/PHI to unauthorized individuals.

107.    The injury and harm that Plaintiff and the other Class Members suffered was the direct and proximate result of Defendants' violation of Section 5 of the FTCA.  Plaintiff and Class Members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, inter alia: (i) a substantially increased risk of identity theft and medical identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII/PHI; (iii) breach of the confidentiality of

their PII/PHI; (iv) deprivation of the value of their PII/PHI, for which there is a well-established national and international market; and (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face.

108.    Defendants' violation of the FTCA constitutes negligence *per se* for purposes of establishing the duty and breach elements of Plaintiff's negligence claim.  Those statutes were designed to protect a group to which Plaintiff belongs and to prevent the type of harm that resulted from the Data Breach.

109.    Defendants owed a duty of care to Plaintiff and the members of the Class because they were foreseeable and probable victims of any inadequate security practices.

110.    It was foreseeable that Defendants' failure to use reasonable measures to protect PII/PHI and provide timely notice of the Data Breach would result in injury to Plaintiff and other Class Members.  Further, the breach of security, unauthorized access, and resulting injury to Plaintiff and the members of the Class were reasonably foreseeable.

111.    It was therefore foreseeable that the failure to adequately safeguard PII/PHI would result in one or more of the following injuries to Plaintiff and the members of the proposed Class: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the deep web black market; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

<u>COUNT III</u>
**BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiff and the Class Against Defendant Geisinger)**

112.    Plaintiff realleges and incorporates by reference paragraphs 1 through 81 as if fully set forth herein.

113.    Plaintiff's and Class Members' PII/PHI was provided to Geisinger in confidence, believing that Geisinger would protect that information.  Geisinger's patients would not have provided Geisinger with this information had they known they would not be adequately protected. Geisinger's acceptance and storage of Plaintiff's and Class Members' PII/PHI created a fiduciary relationship between Geisinger and Plaintiff and Class Members.

114.    In light of this relationship, Geisinger has a fiduciary duty to act for the benefit of its patients, including Plaintiff and Class Members upon matters within the scope of their relationship, which includes safeguarding and protecting Plaintiff's and Class Members' PII/PHI.

115.    Geisinger breached that duty by failing to properly protect the integrity of the system containing Plaintiff's and Class Members' PII/PHI and otherwise failing to safeguard Plaintiff's and Class Members' PII/PHI that it collected.

116.    As a direct and proximate result of Geisinger's breaches of its fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer injury, including, but not limited to (i) a substantially increased risk of identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) the improper compromise, publication, and theft of their PII/PHI; (iii) deprivation of the value of their PII/PHI, for which there is a well-established national and international market; (iv) lost time and money incurred, and future costs required, to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; and (v) the

continued risk to their PII/PHI which remains in Geisinger's possession.

<u>COUNT IV</u>
**BREACH OF CONTRACT**
**(On Behalf of Plaintiff and the Class Against Defendant Geisinger)**

117.    Plaintiff realleges and incorporates by reference paragraphs 1 through 81 as if fully set forth herein.

118.    Defendant Geisinger entered into various written contracts with Plaintiff and Class Members to perform services that include, but are not limited to, healthcare services.

119.    These contracts were made in part for the benefit of Plaintiff and the Class.  Indeed, Defendant Geisinger knew that if it were to breach these contracts with its customers, its customers, including Plaintiff and Class Members, would be harmed by, among other things, fraudulent misuse of their PII/PHI.

120.    It was intended by Defendant Geisinger at the time the contracts were made that Defendant Geisinger would assume a direct obligation to protect Plaintiff's and the Class's PII/PHI.

121.    It was also intended by Defendant Geisinger that the performance under the contract would necessarily and directly benefit Plaintiff and the Class.  Defendant Geisinger would utilize the PII/PHI it collected in providing timely and accurate healthcare services to its customers.

122.    Defendant Geisinger breached its contracts with Plaintiff and Class Members in failing to implement and maintain reasonable security measures to protect and secure their PII and in failing to implement and maintain security protocols and procedures to protect Plaintiff's and Class Members' PII/PHI in a manner that complies with applicable laws, regulations, and industry standards, and resulting compromise of Plaintiff's and Class Members' PII/PHI.

<u>COUNT V</u>
**BREACH OF THIRD-PARTY BENEFICIARY CONTRACT**

**(On Behalf of Plaintiff and the Class Against Defendant Nuance)**

123.    Plaintiff realleges and incorporates by reference paragraphs 1 through 82 as if fully set forth herein.

124.    Defendant Nuance entered into a written contract with Defendant Geisinger to perform services that include, but are not limited to, computer software technology services.

125.    This contract was made in part for the benefit of Plaintiff and the Class, as Plaintiff and Class Members were the intended third-party beneficiaries of the contract entered into between Defendants.  Indeed, Defendants knew that if they were to breach the implied contract with the Geisinger's patients, Geisinger's patients, including Plaintiff and Class Members, would be harmed by, among other things, fraudulent misuse of their PII/PHI.

126.    It was intended by Defendant Nuance at the time the contracts were made that Defendant Nuance would assume a direct obligation to protect Plaintiff's and the Class's PII/PHI.

127.    It was also intended by Defendant Nuance that the performance under the contract would necessarily and directly benefit Plaintiff and the Class.  Defendant Nuance would utilize the PII/PHI it collected in providing timely and accurate computer software technology services for Plaintiff and Class Members, on behalf of Geisinger.

128.    Defendant Nuance breached its obligations under its implied contracts, to which Plaintiff and Class Members are intended beneficiaries, directly resulted in the Data Breach and the injuries that Plaintiff and all other Class Members have suffered.

129.    As a direct and proximate result of Defendants' breach of implied contracts, Plaintiff and all other Class Members suffered and will continue to suffer damages, because (i) they face a substantially increased risk of identity theft—risks justifying expenditures for

protective and remedial services for which they are entitled to compensation; (ii) their PII/PHI was improperly disclosed to unauthorized individuals; (iii) the confidentiality of their PII/PHI has been breached; (iv) they were deprived of the value of their PII/PHI, for which there is a well-established national and international market; and (v) lost time and money incurred, and future costs required, to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face.

### COUNT VI
### UNJUST ENRICHMENT
### (On Behalf of Plaintiff and the Class Against Both Defendants)

130.    Plaintiff realleges and incorporates by reference paragraphs 1 through 81 as if fully set forth herein.

131.    Plaintiff brings this claim, on behalf of herself and the Class, in the alternative to all other claims and remedies at law.

132.    Defendant Geisinger was conferred a monetary benefit upon by collecting Plaintiff's and Class Members' PII/PHI, in the forms of (1) monies paid for services by Plaintiff and Class Members, and (2) the provision of Plaintiff's and Class Members' valuable PII/PHI. Indeed, upon acquiring the PII/PHI, Defendant Geisinger was then able to charge money for its services and utilize the PII/PHI for several purposes, including but not limited providing its services, conducting consumer research, billing, and contacting patients.  The PII/PHI was thus used to facilitate payment and generate additional revenue for Defendant Geisinger.

133.    Defendant Nuance was conferred a monetary benefit upon by collecting Plaintiff's and Class Members' PII/PHI, in the forms of (1) monies paid for services by Geisinger, and (2) the provision of Plaintiff's and Class Members' valuable PII/PHI.  Indeed, upon acquiring the

PII/PHI, Defendant Nuance was then able to charge money for its services from Geisinger and utilize the PII/PHI. The PII/PHI was thus used to facilitate payment and generate additional revenue for Defendant Nuance.

134.  Defendants accepted or had knowledge of the benefits conferred upon it by Plaintiff and Class Members. Defendants profited from these transactions and used the PII/PHI of Plaintiff and Class Members for business purposes.

135.  Upon information and belief, Defendants, like most other corporate entities, funds its data security measures entirely from its general revenue, which includes money paid by Plaintiff and Class Members.

136.  As such, a portion of the payments made for Defendants' services are or should have been used to provide a reasonable level of data security.

137.  Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure the PII /PHI they collect.

138.  Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants avoided their data security obligations at the expense of Plaintiff and Class Members by utilizing less expensive and less effective security measures.

139.  As a direct and proximate result of Defendants' failure to provide the requisite security, Plaintiff and Class Members suffered actual damages.

140.  Defendants should not be permitted to retain the money profited by collecting PII/PHI of Plaintiff and Class Members because Defendants failed to adequately implement the data privacy and security procedures mandated by federal, state, and local laws and industry standards.

141.  Defendants should be compelled to provide for the benefit of Plaintiff and Class

Members all unlawful proceeds received by it as a result of its conduct and the resulting Data Breach alleged herein.

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in her favor and against Defendants as follows:

A.    Certifying that Class as requested herein, appointing the named Plaintiff as Class representative and the undersigned counsel as Class Counsel;

B.    Requiring that Defendants pay for notifying the members of the Class of the pendency of this suit;

C.    Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

D.    Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate.  Plaintiff, on behalf of herself and the Class, seeks appropriate injunctive relief designed to prevent Defendants from experiencing another data breach by adopting and implementing best data security practices to safeguard PII/PHI and to provide or extend additional credit monitoring services and similar services to protect against all types of identity theft and medical identity theft.

E.    Awarding Plaintiff and the Class prejudgment and post-judgment interest to the maximum extent allowable;

F.    Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable, together with their costs and disbursements of this action; and

G.    Awarding Plaintiff and the Class such other and further relief as the Court may

deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: <u>July 3, 2024</u>

Respectfully submitted,

/s/ _____

Benjamin F. Johns (PA ID 201373)
**SHUB & JOHNS LLC**
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
Conshohocken, PA 19428
Tel: (610) 477-8380
bjohns@shublawyers.com

Todd S. Garber (*Pro Hac Vice forthcoming*)
**FINKELSTEIN, BLANKINSHIP**
**FREI-PEARSON & GARBER, LLP**
One North Broadway, Suite 900
White Plains, New York 10601
Tel.: (914) 298-3281
tgarber@fbfglaw.com

*Attorneys for Plaintiff and the Proposed Class*